Statement of the Case.
MONROE, C. J.
Defendant has appealed from a judgment awarding plaintiff damages, as for his alleged noncompliance with a contract whereby he agreed to buy plaintiff’s crop of sugar cane, and plaintiff has answered the appeal, praying for an increase in the amount of the award.
The contract was entered into on June 19, 1911, and reads, so far as it need be .here quoted, as follows, to wit:
“A. A. Lorio owns * * * a sugar cane factory. * * * Isaac Bigman grows * * * sugar cane. Lorio agrees to purchase from, and Bigman agrees ,to sell to, him sugar cane at the price of 82y2 cents per ton for each cent per pound that prime yellow sugar shall sell for in the open market of New Orleans; the price of sugar to be ascertained from the weekly average reports of prices of sugar issued by the New Orleans Sugar Exchange; the cane, delivered, to be paid for each week. * * * Cane shall be cut in the red joints — no white joints permitted — and to be absolutely free from shucks. In the event of a freeze, causing the cane to turn sour, the right is given to Lorio to reject same, and to refuse to receive or purchase the sour cane. * * * In the event of a freeze or bud killer, Isaac Bigman specially binds himself to windrow his cane as soon as notified by Lorio, but Lorio not to be held for cane souring in windrow.”
There were further stipulations, to the effect that Bigman should not use chemical fertilizers, or plant cow peas, upon land planted in cane, or plant cane upon land that had not been in cultivation for at least four years; that no plant cane should be delivered at the factory prior to November 5; and that no cane should be delivered 10 days after notice by Lorio that he was preparing to shut down the factory. Plaintiff alleges that, in consequence of defendant’s refusal to accept it, at the contract price, and of his inability to dispose of it elsewhere, the cane grown by him on 29 acres of land proved a total loss, that he incurred expenses in removing it, and that he delivered 24 tons of cane for which defendant refused to pay the contract price. He prays for judgment in the sum of $3,762.68.
*288 Defendant ■ answered that the contract called for sound—
“cane, hut, that, in consequence of the severe cold weather which prevailed in the months of November and December, 1911, the cane of plaintiff, as well as that of most of the other cane planters in the parish Of Pointe Coupee, was frozen, rotted, and damaged to sucht an extent as to render it unfit for manufacturing, and virtually valueless; and, having found that the cane which was being delivered by the plaintiff was rotten, damaged, and spoiled, respond;ent notified him * * * that he would not pay for same over $1.50 per ton, .delivered at the derrick at Oscar, or $2 per ton, delivered at respondent’s factory; that, after receiving said notice, plaintiff shipped several tons of cane, * * * which were ground by respondent and due credit given for the same at $1.50 per ton, * * * that if petitioner’s cane had been sound, he would gladly have received it at the price stipulated in the contract, which price referred to sound cane, only, * * * and that, as long as petitioner’s cane continued good and sound, it was received and paid for by respondent without demur or objection; * * * that he had made, with a large number of plantr ers, the same contract * * * as that made with plaintiff; that, the cane of said planters having been frozen and damaged, in the same manner as petitioner’s, respondent served on them the same notice and proposition as on petitioner, and all of said planters, readily recognizing the justice and fairness of respondent’s position, agreed to continue to ship their cane to respondent to be paid for on the same terms as offered to petitioner; that is to say, at $1.59 per ton, delivered at the Oscar derrick, and $2 per ton, delivered at respondent’s factory. Petitioner [meaning respondent] shows that the guarantee of $3 per ton contained in said contract did not refer to frozen or rotten cane, but exclusively to sound cane, and was intended to guarantee petitioner $3 per ton for his cane, regardless of any extreme depreciation which might occur in the price of sugar on the New Orleans market.”
It appears from the testimony that, about November 9, 1911, the temperature, in that portion of the sugar-planting region of the state in which plaintiff and defendant conduct their business, • dropped to a point at which it became what is called a “bud killer,” meaning that it froze and killed the tops of the cane, as the more exposed, and, perhaps tenderer, portions; that, some time later there came another and harder freeze, of which a witness, with a planting experience extending over a period of 25 years,, says, “The most disastrous that I have ever known,” and another witness, with a long experience, says, that it was “complete destruction” to all standing cane, and almost as bad to that which had been windrowed; and the second freeze was followed, from, say, the 8th to the 12th of December, by warmer and rainy weather. It also appears that as a result of those conditions almost all the planters in that section of the country lost from one-half to two-thirds of their cane; that of 20 or 25 who were dealing with defendant under contracts similar to that of plaintiff, and who were dealt with by him in the same way, and at the same time, plaintiff is the only one who is making complaint, that most of those who have testified, or have been testified about, were planting nearer to False river than plaintiff, whose plantation is some six or seven miles distant from that stream, and that, though the proximity of water is thought to moderate the effect upon the cane of low temperature, they seem to have suffered from the freezes as much as, or more than, he. It is shown that plaintiff, through tenants, cultivated about 90 acres of land in cane, and he complains, in his petition, of the loss of about one-third of it. His manager testifies, in effect, that about 60 acres of the cane had been delivered before the first freeze, after which the remaining 30 acres (about) were windrowed; that one-third of it, about, proved to be sour; that he began cutting off the sour parts about December 10th or 12th; that he cut it from both ends, and that in so cutting a stalk seven feet long, he would leave from three to four feet that he considered sound. Being asked how he determined as to the proportion that was sound, he answered that he guessed at .the length of the piece that remained and determined its condition by looking at and tasting it, but that he could not say how many stalks he tasted or venture any statement on that subject. Another witness, a *290 civil engineer, who in March, 1912, made a survey of the land upon which plaintiff’s cane had been windrowed, testified that he at that time tasted two or, perhaps, three, stalks of the cane, and that he found it sweet, but, being asked, “Don’t you know it to be a fact that [in] any cane, unfit for the mill by reason of being frozen, you oftentimes come across a piece butted and which is sweet?” he replied, “Well, I expect you do.” Plaintiff himself is not a practical planter; very seldom went to his plantation, and of his own knowledge knew very little of the facts upon which he predicates his claim. His manager, too, was a man of but little experience. Being interrogated upon that subject, he said that he had made four or five crops, which upon further questioning he explained were made for his own account, upon some six or seven acres of land. Upon the other hand, a number of witnesses of long experience were placed on the stand by defendant and testified (as we have already stated) that the season was most disastrous, that some time before Christmas the cane throughout that section of the country, including that delivered by plaintiff to defendant, became so rotten or so sour that it could not be manufactured at a profit, and that the loss sustained by the planters generally amounted to from one-half to two-thirds of their crops. One witness, testifying as to his own crop, stated that he lost one-half of his cane, and that upon a plantation which he managed the loss amounted to 11,500 tons, which was about half of the plantation crop. It was also shown that defendant himself lost about 10,000 tons of cane, which was one-half of his crop. In fact but one planter was produced in the trial who testified that he had saved all his cane, or knew of any one else who had done so, and he, it appeared, planted “about 13 or 20 acres,” within 15 acres of False river, had windrowed promptly, and had delivered the last of his cane at the mill by the 9th of December. Plaintiff’s manager (Mr. Webre), it seems, was one of his neighbors, and planted some seven acres for his own account in the same neighborhood, but he had not windrowed his cane as promptly as the witness, and the latter says in his testimony that though the last of it was delivered on December 9th, he found it “pretty badly frozen.” “I tried to get some cane out of Webre’s carts [he adds], and I could not find any good to eat.” He further says: “I went to Mr. Lorio’s sugar house and tasted, along Christmas week, and I couldn’t stand it.”
Opinion.
It is argued that the cane for which plaintiff is here demanding compensation did not belong to him, but was the property of his tenants, by whom it was raised, and that his rights, as lessor and as factor making advances, give him no standing for the purposes of this suit, or for the recovery of anything more, if for that, than the balance due him as such lessor and factor. It is said, also, that the contract sued on imposed no obligation on plaintiff to ship any given quantity of cane, from which it is argued that it imposed no obligation on plaintiff to receive any given quantity. It is also said that the duty rested upon plaintiff to minimize the loss (if any were really threatened by the action taken by defendant) by endeavoring to find another market for his cane, and that he has failed to show that he made any effort to discharge that duty. Without expressing any opinion as to the questions so presented, we shall direct our attention to the position of the plaintiff and to the merits of the case.
Counsel for plaintiff concede that defendant was within his fights in rejecting sour cane, but they argue that he had no right to reduce the contract price of sweet cane, and they contend that, after plaintiff had cut off the sour ends of the cane, for the price of which he is here suing, he became en *292 titled to the full contract price for the balance, the quantity of which is arrived at hy assuming 29.64 to have been the lost acreage, multiplying those figures by 18 as the tonnage per acre, and multiplying the total tonnage by $4.12, as the price of sound cane, under the contract. There is probably a slight error in the figures thus adopted; for, though the survey made in March, 1912, no doubt showed that 29.64 acres of cane had originally been windrowed, it seems likely from the testimony of Webre, plaintiff’s manager, that some of the windrowed cane was delivered prior to the survey, since he states that the portion that was not delivered amounted to 25 or 30 acres. Counsel appear, also, to have fallen into an error as to the total acreage planted by plaintiff’s tenants, the proportion intended to be sold, and the proportion of loss sustained. Thus they say:
“Auguste Webre, who was the manager on the Bigman plantation, estimates the tonnage in various ways. He tells us that Bigman had about 60 acres planted in cane, for sale to the factory, of which amount 29.64 acres were left in the field, say, 50 per cent, of his crop. He sold and delivered between 1,400 and 1,500 tons of cane.”
The contract declares that, “Isaac Bigman obligates himself to cultivate not less than 170 acres of cane,” etc., and Webre (the name being more frequently spelled in that way) gives the following testimony, to wit:
“Q. Do you know how many acres of cane Mr. Bigman had, last year? A. About 90 acres of good cane. * * * Q. Prom how many acres had the cane been delivered, at the time of that notice [referring to defendants notice of December 29th)? * * * A. About 60 acres, more or less; I don’t remember exactly. Q. How many acres of cane were left in the field, at the time of that notice? A. Between 25 and 30 acres.”
It is evident, therefore, that plaintiff had delivered at least two-thirds of all the good cane that was raised on his place before he received defendant’s notice.
We make the following further excerpt from the brief of the learned counsel for defendant, to wit:
“It appears to be conceded that sugar cane which has been subjected to severe cold turns sour, the souring process commencing at the ends of the stalks of the cane; that the sour portion of the stalk is utterly valueless, as the sour cane juice cannot be converted into sugai or into a merchantable quality of syrup; furthermore, that the portion of the stalk which has become sour can readily be distinguished,' and that it is customary, when preparing the cane for the mill, to cut off the sour portions and throw same away, not permitting it to be loaded on the wagons, weighed, or otherwise disposed of.”
Mr. Churchill, the experienced planter and manager, to whose testimony we have already referred, gave the following testimony as to the method of determining the condition of the cane, to wit:
“Q. As a rule, can you tell frozen cane by its appearance. A. No, sir; without your splitting it you can’t, from looking at it, unless it is very bad. Q. In determining, or in testing the quality of cane, with relation to its being frozen or not, how do you proceed, when the cane is in a wagon or car. A. We took a stalk, cut it in two and split it, and hold that split end, and you can ascertain, the extent of the frozen cane. * * * Q. In case a car of cane is delivered at your mill, which you have reason to fear is injured, and you desire to test it, how many stalks, as a rule, would be split, or cut, or tasted, in order to determine the quality of the cane? A. About 30 stalks.”
Mr. Webre’s examination upon the question under consideration reads in part as follows:
“Q. Do you mean to say that the cane Mr. Bigman had in the field on the 29th of December was not frozen and sour, but, on the contrary, was sound? A. No, sir; they were not all sound, but a part was sound. Q. Will you state the proportion that was sound and the proportion that was not? * * * A.' Prom three to four feet was sound. *
“By the Court: Q. What was the average length of that cane? A. Six to seven feet long.
“By Mr. Provosty: Q. Out of that, what average of it was sound, in this six or seven feet? A. From three to four feet was sound. Q. How do you know that to be a fact? A. Well, I guess it about to be a fact; I didn’t measure by the length of it. Q. What I mean to ask is, how do you know, Mr. Webre, that that proportion of the stalk was sound and the other proportion was sour? A. Because I cut it and tasted it and judged by that what was good and what was bad. * * * Q. In a ton of cane, will you say how many stalks you would taste in order to ascertain its condition? A. I didn’t taste them all, sure enough. Q. About? A. I don’t know how many. Q. Four *294 or five? A. May be, sometimes 20; I couldn’t tell. Q. You wouldn’t venture any statement along that line at all? A. No, sir.”
[2] Upon the whole, we conclude that, unless the cane was very bad, meaning visibly rotten, there were but three ways of determining whether it was fit for use; the one, uncertain and unsatisfactory, by splitting and tasting it, another by chemical analysis of the juice, and the third by attempting to make sugar of it. Mr. Webre applied the first test, in the manner and to the extent stated by him. The pieces of the stalks, from which the ends had been cut off haphazard, by the tenants who had raised it, were then placed in the carts and hauled to the derrick, where, the tasting test being applied by defendant’s representatives, a great deal of it was rejected before the Christmas holidays, and that which was accepted at the derrick, having been shipped to the mill, still more of it was rejected, upon the application of the same test, after which it was run through the mill, as the cheapest way of getting rid of it, and, the attempt to manufacture sugar at a profit, from the balance, which had not been rejected at the mill, having proved unsuccessful, defendant gave the notice contained in his letter of December 29th.
The position of the learned counsel for plaintiff, in regard to the action so taken, is stated in their brief, as follows:
“We find that the defendant never failed to exercise his rights under the contract, and refused to receive, rejected, and declined to purchase, cane tendered to him which, in his judgment, was sour and unfit for manufacturing purposes. We also find that plaintiff uttered no protest when defendant exercised this right; that in fact and in truth no complaint was made by plaintiff until defendant arbitrarily reduced the purchase price of cane over 60 per cent.; his sole reason for so doing being that he was not getting results.”
If, however, the reason that plaintiff failed to obtain results was that the cane failed to make sugar, because it was wholly or partly sour, the fact that it had passed the first, and somewhat uncertain, tasting test, did not deprive him of his right to reject, it, or refuse to pay the contract price, when it failed to stand the manufacturing test. He states that he was actuated in offering to pay any price at all, at that time, by a desire to help the planters out; and it was to his interest so to do, in order to keep' them as his customers. He dealt with plaintiff as he did with his own brothers and his other customers, and it appears to us that he acted in good faith towards all of them, and that his action was justified by the facts.
[1] In the case of Meraux v. Kenilworth Sugar Co., 135 La. 39, 64 South. 974 (recently decided), it was held that, even where there is no specific provision in a contract authorizing a manufacturer to reject sour cane, his agreement to pay a sound price entitles him to a sound article.
That ease, like this, arose out of a contract for the sale of a cane crop of 1911, for part of which a reduced price was offered on account of its having been injured by the same cold weather which injured plaintiff’s cane; the main differences being that the plaintiff, in the cited case, continued to deliver his cane at the reduced price of which he was notified, reserving his right eventually to sue for the contract price, and that the region of country in which the controversy arose is considerably farther south than the parish of Pointe Coupee, and the cane was more protected from the effects of the cold by adjacent bodies of water. The opinion of the court fixes the date of what was probably the second freeze in Pointe Coupee as November 29th, 30th, and it was said that:
“As the juice of frozen cane does not turn sour until fermentation takes place, the testing of cane by smell and taste, after a freeze, is no proper index of its condition when delivered at the factory.”
Por the reasons thus assigned, the judgment appealed from is set aside, and plaintiff’s demand is rejected and his suit dismissed, at his cost in both courts.
*296 PROYOSTY, J., not having heard the argument, takes no part. O’NIELL, J., takes no part.